**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CV-60416-ALTMAN/Hunt**

**GLADYS ALVARADO**,

   *Plaintiff,*

*v.*

**KILOLO KIJAKAZI**,
*Acting Commissioner of the Social Security*
*Administration,*

   *Defendant.*

_____/

**<u>ORDER</u>**

   Our Plaintiff, Gladys Alvarado, appeals the Defendant's denial of her application for Social Security benefits. *See* Compl. [ECF No. 1]. The parties filed cross-motions for summary judgment—*see* Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ") [ECF No. 11]; Defendant's Combined Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 15]—which we referred to U.S. Magistrate Judge Patrick M. Hunt for a report and recommendation, *see* Order of Referral [ECF No. 10].

   In his Report & Recommendation (the "R&R") [ECF No. 17], Magistrate Judge Hunt recommended that we deny the Plaintiff's MSJ and grant the Defendant's MSJ. *See* R&R at 1. The Plaintiff objected to the R&R, *see* Objections ("Obj.") [ECF No. 18]—and the Defendant responded in opposition to those Objections. *See* Response [ECF No. 19]. After careful review, we **OVERRULE** the Objections, **ADOPT** the R&R, **DENY** the Plaintiff's MSJ, and **GRANT** the Defendant's MSJ.

BACKGROUND[1]

On July 27, 2020, Alvarado applied for supplemental social security income, claiming that she's been disabled since March 1, 2020. *See* R. at 250, 258. After her application was denied twice—first on November 19, 2020, and then again on January 27, 2021—Alvarado appeared at a hearing before an Administrative Law Judge ("ALJ"). *See id.* at 46–68, 141, 161. In the written decision that followed, the ALJ concluded that "the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act." ALJ Decision at 15. When the Social Security Administration's ("SSA") Appeals Council declined to revisit the ALJ Decision, *see* R. at 6, Alvarado appealed to us, *see generally* Compl.

In her final decision, which we review here, the ALJ applied the SSA's five-step inquiry.[2] *See generally* ALJ Decision. At Steps One and Two, the ALJ determined that Alvarado hasn't engaged in substantial gainful activity since March 1, 2020, *id.* at 3, and that she suffers from "severe impairments . . . [that] significantly limit the ability to perform basic work activities[.]" *Id.* at 4.

---

[1] The following facts are taken from the certified administrative record. *See* Social Security Transcript ("R.") [ECF No. 9]. The ALJ Decision can be found at R. 26–45. Since we cite it so often, we'll paginate the ALJ Decision separately—*i.e.*, we'll refer to the first page of the ALJ Decision as ALJ Decision at 1, rather than R. at 26.

[2] That inquiry helps the ALJ determine whether a claimant is disabled by reference to the following five questions:

> (1) [W]hether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functioning capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v); and then citing 20 C.F.R. § 416.920(a)(4)(i)–(v)).

At Step Three, the ALJ found that Alvarado "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [20 C.F.R. § 404.1520(d).]" *Id.* at 6. In reaching this conclusion, the ALJ considered, *first*, "all of the claimant's medically determinable impairments, including those that are not severe," *id.* at 4, and, *second*, "the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders," *id.* at 5.

At Step Four, the ALJ determined that Alvarado "has the residual functional capacity to perform light work," including "lift[ing] and carry[ing] 20 pounds occasionally and 10 pounds frequently," "stand[ing]/walk[ing] for six hours in an eight-hour day and [ ] sit[ting] for six hours in an eight-hour day," and "frequently stoop[ing], kneel[ing], crouch[ing], crawl[ing], and climb[ing] ramps, stairs, ladders, and scaffolds," with "no limits on the ability to balance." *Id.* at 6. The ALJ based this conclusion on her consideration of "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. . . . [and] the medical opinion(s) and prior administrative medical finding(s)[.]" *Id.* at 7; *see also id.* at 7–13.

With respect to Alvarado's self-reported symptoms, the ALJ followed "a two-step process," in which she first "determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms." *Id.* at 7. Then, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown," the ALJ evaluated "the intensity, persistence, and limiting effects . . . to determine the extent which they limit the claimant's work-related activities." *Ibid.* "[W]hen statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ weighed Alvarado's statements against "other evidence in the record to determine

if [her] symptoms limit the ability to do work-related activities." *Ibid.* The ALJ recounted Alvarado's

self-reported symptoms as follows:

> The claimant makes the following allegations regarding the intensity, persistence, and limiting effects of her symptoms. She alleges disability due to breast cancer stage II, bone pain, fibromas, hand and finger problems, stomach hernia, and eye problems. Her conditions affect lifting, squatting, bending, standing, reaching, kneeling, stairclimbing, and using hands. She can walk for 30 minutes before she needs to stop and rest for five to ten minutes before resuming walking. . . . Sometimes she is stressed about her illness, which can cause depression or anxiety. . . . She has pain in her bones, knees, back, and hands. She experiences pain every day for four to six hours at a time. She uses Tylenol and Aleve to relieve her pain, which works for a few hours only. Her hands go numb. The medication she takes for breast cancer causes her to have bone pain and constipation. . . . She suffers from insomnia or the pain in her bones does not let her sleep.
>
> The claimant testified she can stand for 30 to 60 minutes maximum. She can sit for about two hours. Her problem is that after a while she cannot stand up anymore. After two hours of sitting, she gets cramps in her legs and feels that her bones do not respond. . . . She feels like the bones are coming out of her hands. She had more problems with her right hand than her left and has to grab cups with her left hand. She is right-handed. Her hands hurt and swell every day. . . . She has to lie down during the day due to dizziness for about 30 to 40 minutes. She forgets a lot of things, especially dates and sometimes where she has things. She forgets things two to three times per week. She forgets that she has appointments with doctors. She has side effects from her medications of sleepiness. She falls asleep all day and has a lot of dizziness.

*Id.* at 7–8.

The ALJ considered these symptoms against Alvarado's reported functions of daily living—

*i.e.*, her domestic activities and her ability to perform self-care and routine housekeeping tasks. *Ibid.*

Of these skills, Alvarado testified:

> She can pay attention for one hour. She finishes what she starts. She follows written and spoken instructions well. She gets along with authority figures well. She has no problems getting along with others. . . . On a typical day, she cooks all three meals, showers, cleans her home, and tends to her garden, but she has to do things at a slow pace and not overexert herself. It hurts to dress and bathe herself and care for her hair because it is painful to bend or put her arms up too long. She needs help/reminders to take her medication because she is forgetful at times of where she puts things. She prepares complete meals two to three times a day. . . . It takes her a couple of hours total to prepare meals. She needs help lifting and bending and has to cook at a slow pace. She cleans counters, waters her garden, and needs help with laundry. She does these things almost daily, but at other times she is too fatigued to move. She tries to

go out daily but with caution. She can drive. She shops for food and necessities in stores and by mail one to two times a week, which takes 30 to 90 minutes. She has no problems handling her finances. She enjoys cooking, tending to her garden, and watching TV which she does often but at a slower pace because of pain. She spends time with others talking and eating one to two times a week. There has been no change in her social activities. It hurts to pick up her grandchildren. . . . The claimant testified she can stand for 30 to 60 minutes maximum. She can sit for about two hours.

*Ibid.*

Ultimately, the ALJ concluded that Alvarado's "statements about the intensity, persistence, and limiting effects of her symptoms" were "inconsistent," and that they "do not support the existence of [greater] limitations[.]" *Id.* at 9. Specifically, while the ALJ noted Alvarado's complaints that "[s]he feels like the bones are coming out of her hands" and that "[h]er hands hurt and swell every day," *id.* at 8, she discounted these self-reported symptoms because, among other things, "[r]eview of systems by [Alvarado's] primary care provider noted for musculoskeletal: no concerns about muscle pain or weakness, swollen or sore joints," *id.* at 9. The ALJ also weighed Alvarado's symptoms against her medical records, including primary-care notes of "no complaints" and "no pain," *ibid.*, and an "entirely normal" physical examination, *ibid.*

Still in Step Four, the ALJ proceeded through a detailed examination of Alvarado's medical records. As the ALJ noted, Alvarado says she became disabled in March 2020.[3] *Id.* at 3. That month, she saw her primary-care provider, Dr. Oscar Mendez, who recorded "no complaints" and "noted no concerns." *Id.* at 9. According to Dr. Mendez's records, Alvarado "reported no pain," and her "[p]hysical examination was entirely normal[.]" *Ibid.* Seven months later, in October 2020, Alvarado had a follow-up appointment regarding her breast cancer. *Ibid.* At that appointment, the ALJ acknowledged, "[s]he was noted to be having an awful time with arthritis, having swelling of the fingers

---

[3] That's also when Alvarado lost her kitchen job because of the COVID-19 pandemic. *See* ALJ Decision at 5 ("She reported she was laid off in March 2020 because of Covid."); *see also* R. at 115 ("The claimant has had generalized 'bone pain' from this [hormone suppression] treatment, but was working full-time in a hotel kitchen until March 2020 when [she] was laid off due to Covid-19.").

and wrist, having night sweats and lost weight." *Ibid.* And these symptoms seem to have been evident to the physician, too: Records from this October 2020 visit reflect that "[s]welling and synovitis of the PIPs[4] and wrists was noted on examination. Letrozole was changed to tamoxifen to attempt to lessen the joint pains. She was also started on a low dose of prednisone. At the end of October, she reported she was having side effects to tamoxifen and she was changed to anastrozole." *Ibid.*[5]

The ALJ then turned to the records of an October 2020 consultative exam[6] with Dr. Aurora Luna, during which Alvarado reported "experiencing bone pain since starting her cancer treatment, with pain in her knees, legs, hands, and elbows. She also reported a hard time using her right hand since a previous right shoulder surgery and hernia after a prior gallbladder surgery." *Ibid.* Despite these complaints, the ALJ noted that Alvarado's "physical exam was overall normal. She had some mild difficulty opening her left fingers after closing them in a tight grip. Fine and gross manipulations were normal bilaterally, as was grip strength at 5/5 bilaterally." *Ibid.* "Range of motion of the right shoulder was decreased with flexion," the ALJ acknowledged, "but otherwise normal in all joints." *Ibid.* And, notably, "[t]here were no complaints of tenderness during examination of the extremities." *Ibid.* Alvarado told Dr. Luna that she "independently" performed various activities of daily living, including "feeding, using public transportation, performing personal hygiene, cooking, managing funds, and buttoning and unbuttoning shirts and pants." *Ibid.* Based on all this, Dr. Luna "opined [Alvarado] has

---

[4] The proximal interphalangeal (PIP) joints are the middle knuckles of human fingers.

[5] Alvarado saw her doctor (Schiuma) again in April and May of 2021 "for some complaints of pain in the fingers, knees and feet," but the ALJ observed that, "[o]therwise, there is no evidence of medical treatment after October 2020." *Id.* at 9; *see also infra* at 19.

[6] "SSA's rules provide for using an independent source (other than the treating source) for a C[onsultative] E[xamination] or diagnostic study if: The treating source prefers not to perform the examination; There are conflicts or inconsistencies in the file that cannot be resolved by going back to the treating source; The claimant prefers another source and has a good reason for doing so; or Prior experience indicates that the treating source may not be a productive source." *Consultative Examinations: A Guide for Health Professionals*, SOC. SEC. ADMIN., https://www.ssa.gov/disability/professionals/greenbook/ce-guidelines.htm (last visited Mar. 16, 2023).

the ability to perform activities involving sitting, standing, walking, lifting, carrying and handling objects, moving about, hearing, seeing, speaking, and traveling." *Id.* at 10. The ALJ also noted Dr. Luna's conclusion that "there were no gross limits seen to [Alvarado's] activities and she can lift, push, pull, bend, stoop, squat, kneel, crawl, and crouch if needed, and can climb stools/small ladders, if needed, and walk up and down steps with rails." *Ibid.* Regarding mental ability, "Dr. Luna further opined the claimant can do work-related mental activities involving common understanding and memory, sustain concentration and persistence, social interaction, and adaptation." *Ibid.* The ALJ found Dr. Luna's opinion "somewhat persuasive, as it is supported by the overall normal examination findings, but the record as a whole is consistent with a residual functional capacity for a range of light level work based on [Alvarado's] reports of pain and dizziness due to her cancer mediations . . . [and] some crepitus in the knees, tenderness in the left heel, obesity, and trigger fingers[.]" *Ibid.*

Next, the ALJ reviewed two reports by Alvarado's oncologist, Dr. Luis Barreras.[7] In November 2020, Dr. Barreras provided a "mental medical source status report." *Ibid.* In that report, Dr. Barreras noted that Alvarado "was diagnosed with mild anxiety with her breast cancer in 2019," and that she was "struggling to keep up with medical visits" because she didn't have insurance. *Ibid.* Despite her anxiety, Dr. Barreras "noted coherent thought process within normal limits; good concentration within normal limits; orientation normal to time and place; memory within normal limits; and behavioral observations of good appearance." *Id.* at 11. He also observed that Alvarado "had complete understanding of daily activities and concentration is within normal limits." *Ibid.* Based on all this, "Dr. Barreras opined [Alvarado] was capable of sustaining work activity for eight hours a day, five days a week," and the ALJ accepted this opinion "as it is supported with the noted mental

---

[7] The ALJ misspells his name as "Barrerag." For clarity, we've corrected the spelling in our quotations of the ALJ Decision.

findings by the doctor and overall normal mental findings in the record as a whole and by the consultative examiner." *Ibid.*

In July of 2021, Dr. Barreras provided a "medical physical source statement," in which he opined—in stark contrast to his previous assessment—that "the claimant could not work, as she had severe neuropathy, dizziness, ongoing headaches, medication side effects, and joint and extremity pain." *Ibid.* And, when he said that Alvarado "could not work," he *really* seems to have meant it: Dr. Barreras specified that "Alvarado needs to lie down to rest more than five hours in the morning and more than five hours in the afternoon. . . [and she] cannot perform any mental activities during an eight-hour workday and would be off task more than 60% of the day." *Ibid.* He ultimately concluded that Alvarado "would be absent from work 365 days." *Ibid.* The ALJ found this opinion unpersuasive and noted that she needn't "provide articulation about the evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c)." *Ibid.* Nevertheless, the ALJ explained that Dr. Barrera's second opinion "does not explain how there was such a dramatic departure from his opinion 8 months earlier"—when he had opined that Alvarado "was capable of sustaining work activity for eight hours a day, five days a week"—and "is not supported by Dr. Barreras's longitudinal treatment notes and is inconsistent with the record as a whole, [and] is also inconsistent with [Alvarado's] reports and testimony as to her activities of daily living." *Ibid.*

The ALJ also considered a July 2021 medical-source statement from Alvarado's orthopedic surgeon, Dr. Anthony Schiuma.[8] *Ibid.* Dr. Schiuma opined that Alvarado "can occasionally lift less than 10 pounds, stand and/or walk for a total of less than two hours in an eight-hour workday, and sit for two hours in an eight-hour workday." *Ibid.* Alvarado could "climb, balance, stoop, bend, kneel, crouch, crawl, reach in all directions, handle, and finger," he continued, "for less than one-third of the workday," and she'd need "a 10-minute break every 60 minutes due to diffuse pain and would need

---

[8] The ALJ sometimes misspells his name as "Schivma." We've corrected the spelling in this Order.

to lie down for one hour in the morning and one hour in the afternoon to relieve pain." *Ibid.* Overall, Dr. Schiuma opined that Alvarado "would be expected to be off work tasks 50 to 60% of the day and would be absent three days per month." *Ibid.* The ALJ found this opinion unpersuasive "as it is not generally supported by the two examinations completed by Dr. Schiuma and is inconsistent with the record as a whole." *Ibid.* Specifically, the ALJ contrasted Dr. Schiuma's exams, in which he "noted only triggers [sic] fingers, crepitus in the knees, and tenderness of the left heel" (and Dr. Barreras's observation of "some synovitis/tenderness in the PIPs/wrists") with Dr. Luna's note that Alvarado "was able to perform gait, station, heel-to-toe, tandem walk, and knee squat with minimal difficulty; physical examination was within normal limits; and orthopedic examination was within normal limits for age and condition." *Id.* at 11–12. Here, the ALJ also recounted that Alvarado's "primary care provider noted no abnormalities on physical exam," undermining *both* Dr. Barreras's *and* Dr. Schiuma's opinions. *Id.* at 12.

The ALJ took note of a few other sources, too: She considered a letter from Marie Vales-Preval, PA-C, another of Alvarado's providers, who wrote that Alvarado "is affected with multiple health conditions, including right breast cancer for which she has undergone a mastectomy, diabetes mellitus type II, hypertension, chronic low back pain secondary to sciatica, and severe leg cramps." *Ibid.* Vales-Preval opined that, "due to her chronic medical conditions and her inability to work, [Alvarado] needs health insurance in order to receive medical care that is needed to help improve her quality of life." *Ibid.* As with Dr. Barreras's July 2021 report, the ALJ rejected Vales-Preval's letter as "inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c)." *Ibid.* The ALJ then turned to the opinions of the Disability Determination Services' ("DDS") reviewing medical consultants. Those consultants concluded that Alvarado "is capable of light level work with postural limitations," and the ALJ found these views compelling because "[t]he opinions are supported with citations to the objective evidence and are consistent with the record as a whole[.]" *Ibid.* Finally,

the ALJ reviewed opinions from DDS psychological consultants, who found that Alvarado's "mental impairments are nonsevere with only mild limitations in the paragraph B functional areas." *Ibid.* Again, the ALJ found these opinions persuasive because they, too, "are supported with citations to the record and are consistent with the record as a whole." *Ibid.* There was one outlier, though: The ALJ recalled how "[t]he one-time consultative psychological evaluation noted poor to fair immediate memory, but good recent and remote memory; poor to fair ability to do calculations; poor ability for abstract reasoning; and fairly good judgment." *Ibid.* She explained that, while this opinion was "consistent with [Alvarado's] presentation on that day," "the consultative examiner's opinions are *not* consistent with the record as a whole and as such, it is [sic] not very persuasive." *Ibid.* (emphasis added).

In sum: Based on her "careful consideration of the evidence"—which, as we've summarized, included a thorough review of the notes and records of Alvarado's treating physicians, the opinions of consultative examiners, and Alvarado's own testimony—the ALJ found "that [Alvarado's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.* at 10. In saying so, the ALJ *partially* credited Alvarado's "complaints of bone pain and joint pain, which she states is due to her cancer medication," but contrasted these self-reported symptoms with "physical examinations, [which] nevertheless, have been overall unremarkable other than some crepitus in the knees, tenderness in the left heel, swelling and synovitis of the PIPs and wrists, and trigger fingers," which were "treated with steroids and tramadol." *Ibid.* Similarly, the ALJ contrasted Alvarado's "reported medical side effects of dizziness, tiredness, and constipation" with the relatively "little evidence of treatment during the period at issue," which is at least partially attributable to Alvarado's "reported inability to get medical care due to loss of insurance and no financial ability." *Ibid.* Set against the backdrop of Alvarado's "reported overall normal activities of daily living, including preparing

complete meals two to three times a day, gardening/caring for her plants, light household chores, grocery shopping, spending time with her family, independent personal care, no problems handling her finances, and driving," *ibid.*, the ALJ ultimately concluded that "the contentions regarding the severity of [Alvarado's reported symptoms] and the related functional restrictions are not fully supported," *id.* at 13.

At Step Five, the ALJ concluded as follows: "Based on the testimony of the vocational expert, . . . considering [Alvarado's] age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate[.]" *Id.* at 14–15. According to the ALJ, then, "[Alvarado] has not been under a disability, as defined in the Social Security Act, from March 1, 2020, through the date of this decision[.]" *Id.* at 15.

## STANDARD OF REVIEW

Our review of an ALJ's decision is "limited to an inquiry into whether there is substantial evidence to support the findings of the [ALJ], and whether the correct legal standards were applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This determination—whether the ALJ applied the correct legal standard—is a legal one subject to *de novo* review. *Graham v. Bowen*, 90 F.2d 1572, 1575 (11th Cir. 1986) (citation omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Lewis v. Callahan*, 12 F.3d 1436, 1439 (11th Cir. 1997). The Court may not, however, "reweigh the evidence, or substitute [its] judgment" for the ALJ's—even if the "evidence preponderates against the [ALJ's] decision." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citation omitted).

When a party objects to a report and recommendation, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(3). "A general objection, or one that merely restates the arguments previously presented[,] is not

sufficient to alert the court to alleged errors on the part of the magistrate judge. An objection that does *nothing more than state a disagreement* with a magistrate's suggested resolution, or *simply summarizes what has been presented before*, is not an 'objection' as that term is used in this context." *VanDiver v. Martin*, 304 F. Supp. 2d 934, 937–38 (E.D. Mich. 2004) (emphasis in original); *cf. Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings."). "Objections to a magistrate judge's recommendation and report must be specific and clear enough to permit the district court to effectively review the magistrate judge's ruling." *Knezevich v. Ptomey*, 761 F. App'x 904, 906 (11th Cir. 2019) (cleaned up).

## THE R&R

In her MSJ, Alvarado advanced four arguments:

(1) Whether the decision of the Administrative Law Judge ("ALJ") was supported by substantial evidence given that the record documents trigger fingers on both hands, limited ability to perform reaching due to pain caused by bilateral mastectomy secondary to breast cancer, and swelling and pain in both hands and given that the ALJ failed to include any limitations associated with use of hand and fingers in the residual functional capacity ("RFC") assessment.

(2) Whether the ALJ's decision was legally sufficient and supported by substantial evidence given that the ALJ found that Ms. Alvarado has mild limitations in adapting or managing herself; given that the ALJ failed to include this limitation in the RFC assessment; given that Commissioner's own rulings state that even mild, non-severe impairments may preclude past relevant work or other work; and given that the law requires the ALJ to consider mental impairments in the RFC regardless of whether they are severe.

(3) Whether the ALJ properly considered the side effects of Ms. Alvarado's medications and other non-exertional impairments given that the record documents side effects and nonexertional impairments of sleepiness, hair loss, dizziness, blurred vision, confusion, sweating, drowsiness, impaired ability to drive, nervousness, headaches, and weakness; given that the evidence indicates that these problems limit, among other things, Ms. Alvarado's ability to lift, sit, stand and drive; and given that the ALJ, while recognizing some of these side effects, failed to determine whether they impact Ms. Alvarado's RFC.

(4) Whether the ALJ's decision was supported by substantial evidence given that she relied on the testimony of a vocational expert ("VE"), who solely relied on the third-party software, Job Browser Pro, for supporting his job numbers

> information, and given that the software is not recognized as a reliable source of
> job number data by the Regulations and courts.

Pl.'s MSJ at 1–2. Magistrate Judge Hunt found—with respect to all four arguments—that the ALJ's conclusions were supported by substantial evidence. *See* R&R at 5 ("Here, the undersigned finds that substantial evidence supports the ALJ's evaluation of Plaintiff's manipulative restrictions."); *id.* at 11 ("The ALJ did not err at step two and properly considered Plaintiff's mental capabilities in the RFC assessment. . . . [T]he ALJ's RFC assessment is supported by substantial evidence."); *id.* at 15 ("Therefore, the undersigned finds that the ALJ's evaluation of the side effects caused by Plaintiff's medication is supported by substantial evidence."); *id.* at 17 ("[T]he undersigned finds that the ALJ's step five evaluation, based upon the record and the evidence and testimony before her, is supported by substantial evidence."). Finding no error in the ALJ's work, the Magistrate Judge recommended that we deny Alvarado's MSJ and grant the Defendant's MSJ. *Id.* at 1.

### ALVARADO'S OBJECTIONS

Unhappy with this result, Alvarado has lodged five objections to the R&R. *See generally* Obj. In her First Objection, she contends that "[t]he ALJ failed to properly consider the Plaintiff's problems with using hands and fingers and failed to properly consider the opinions of Dr. Schiuma and Dr. Barregas [sic] which supported significant functional limitations due to these impairments." *Id.* at 1. Here, Alvarado suggests that Magistrate Judge Hunt erred when he "concluded that substantial evidence supports the ALJ's conclusions concerning manipulative restrictions because 'medication was treating these conditions, Plaintiff's examinations were mostly normal and the Plaintiff could perform a wide range of activities during her day such as gardening and cooking, which require finger manipulation.'" *Ibid.* (quoting R&R at 6). On the contrary, Alvarado says, "the evidence in the record demonstrates that medications do not improve the Plaintiff's symptoms," *ibid.*, and that the "ALJ essentially cherry-picked facts that supported her decision and ignored the facts from the same document, indicating that the Plaintiff could not perform these tasks consistently and at a normal

pace," *id.* at 2. "The ALJ's failure to address these key facts," Alvarado insists, "resulted in a decision unsupported by substantial evidence." *Ibid.*

In her Second and Third Objections, Alvarado maintains that "[t]he ALJ did not properly discount the opinions of Dr. Schiuma and Dr. Barreras dated in July 2021." *Id.* at 3. In saying so, however, she simply regurgitates the same arguments she offered up in her MSJ—without explaining how the R&R erred in rejecting both arguments. In fact, she doesn't mention the R&R *at all* in her two-page discussion of Drs. Schiuma and Barreras. *Id.* at 3–4. As the Eleventh Circuit has explained: "Objections to a magistrate judge's recommendation and report must be specific and clear enough to permit the district court to effectively review the magistrate judge's ruling." *Knezevich*, 761 F. App'x at 906 (cleaned up). We don't, in other words, consider "conclus[ory] objection[s]" that simply "renew[ ] all of the arguments raised in Plaintiff's brief[.]" *Buffington v Comm'r of Soc. Sec.*, 2012 WL 3715107, at *1 (M.D. Fla. Aug. 28, 2012) (Conway, J.). More on this in a moment.

In her Fourth Objection, Alvarado criticizes the ALJ for concluding "that the Plaintiff has certain mild mental limitations"—without explaining "how these limitations affect her RFC and improperly failed to include these limitations in the RFC assessment." Obj. at 4. Here, she takes issue with the R&R's conclusion that "the Plaintiff did not identify any limitations caused by mild mental limitations that would 'prevent the Plaintiff from performing the type of light work described in the RFC,'" *id.* at 5 (quoting R&R at 12 (cleaned up)), and she argues that "[t]his is incorrect because the ALJ herself listed such limitations when rating the Plaintiff's mental impairments," *ibid.* And "the ALJ's failure to exclude the mental limitations from the hypothetical question to the VE," Alvarado continues, "cannot be harmless where the ALJ chooses to rely on the VE testimony rather than the D[ictionary of] O[ccupational] T[itles]." *Ibid.*

Finally, in her Fifth Objection, Alvarado avers that the "VE's reliance exclusively on Job Browser Pro resulted in a decision unsupported by substantial evidence" and maintains that Magistrate

Judge Hunt was wrong to "rely[ ] on unpublished district court authority [to] state[ ] that Eleventh Circuit endorsed Job Browser Pro methodology." *Id.* at 6. In saying so, Alvarado insists that the "Eleventh Circuit in *Goode* [*v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1284 (11th Cir. 2020)] instructed t[he] ALJ to use any available methods such as Job Browser's Pro occupational density method 'in conjunction with the VE's knowledge and expertise.'" *Ibid.* (quoting *Goode*, 966 F.3d at 1284 (cleaned up)).

## ANALYSIS

We'll start with Alvarado's Second and Third Objections—which aren't proper objections at all. As we've said, Alvarado's blanket plea for us to reweigh the opinions of Drs. Schiuma and Barreras isn't "specific and clear enough" to allow us to review the R&R—which, after all, is what we're here to do. *See Knezevich*, 761 F. App'x at 906. "It is reasonable to place upon the parties the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). Were we to loosen (or disregard) this rule, any litigant could circumvent the magistrate-judge referral system (and get two bites at the apple) by asking the district court, once the magistrate judge has ruled against her, to reevaluate the whole case. We won't be a part of any effort to undermine the important work of our magistrate judges because "the magistrate judge system was created to help alleviate the workload of the district judges[.]" *Williams v. McNeil*, 557 F.3d 1287, 1291–92 (11th Cir. 2009); *see also Schultz*, 565 F.3d at 1361 ("This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act."); *cf. United States v. Benton*, 523 F.3d 424, 429 (4th Cir. 2008) ("The Magistrates Act . . . was passed by Congress to ease the rapidly increasing and overwhelming caseload burden of many district courts[.]" (cleaned up)). We, in short, overrule out of hand Alvarado's Second and Third Objections, which—rather than identify the R&R's (purported) failings—seek only to relitigate the MSJ.

All that said, we've reviewed those portions of the R&R in which the Magistrate Judge addressed the subject matter of these two Objections and find no error there. In her Second Objection, Alvarado says: "The ALJ failed to properly consider the opinion of Dr. Schiuma" because she "relied on evidence which pre-dated Dr. Schiuma's April and May 2021 examinations for rejecting Dr. Schiuma's opinion," in which he "listed trigger fingers as the reason for manipulative limitations." Obj. at 3. "The ALJ," Alvarado contends, "appears to be rejecting [the April and May 2021 opinions] because the Plaintiff's March 2020 primary care visit and the consultative examination from October 2020 did not list trigger finger problems." *Ibid.* If Alvarado is suggesting that the ALJ ignored (or otherwise discredited) Dr. Schiuma's *diagnosis* of "trigger fingers," that's just flat wrong. *See* ALJ Decision at 4 (describing "[t]he claimant's medically determinable impairments of uterine fibroids, two tiny lateral ventral hernias, plantar fasciitis, obesity, *and trigger fingers*" (emphasis added)). If, on the other hand, Alvarado is quibbling with the ALJ's assessment of the extent of her trigger-fingers limitations, we agree with the Magistrate Judge's conclusion that the "ALJ complied with regulations and properly evaluated Dr. Schiuma's opinions." R&R at 8. The ALJ, after all, found Dr. Schiuma's opinion "unpersuasive, as it is not generally supported by the two examinations completed by Dr. Schiuma and is inconsistent with the record as a whole," ALJ Decision at 11, and she proceeded to explain (in painstaking detail) *why* she found that opinion inconsistent with the record, *see ibid.* We take Alvarado's point that the ALJ *could*—perhaps *should*—have weighed these opinions differently. She may even be right (though we needn't resolve this question) that the evidence predominates in her favor. But the law is clear that we may not "reweigh the evidence or substitute [our] judgment" for the ALJ's—even if the "evidence preponderates against the [ALJ's] decision." *Bloodsworth*, 703 F.2d at 1239 (cleaned up). We therefore find no error in the Magistrate Judge's conclusion that "substantial evidence supports the ALJ's evaluation of Dr. Schiuma's opinion," including the ALJ's comparison of "Dr. Schiuma's opinion *to his own notes*[.]" R&R at 8 (emphasis added).

16

Alvarado's Third Objection fares no better. Here, she (again) attacks the ALJ's Decision—not the R&R—for "not properly review[ing] Dr. Barrera's [sic] opinion and reject[ing] it on irrelevant grounds." Obj. at 4. As we've highlighted, this objection is based on two disagreements with the ALJ. *One*, she claims that the ALJ was "simply wrong" to declare that Dr. Barreras's July 2021 opinion constituted "a dramatic departure" from his November 2020 opinion. *Ibid.* (citing ALJ Decision at 11). The opinions aren't inconsistent, Alvarado insists, because the November 2020 report was based on "the Plaintiff's mental impairments," while the July 2021 report evaluated her *physical* limitations. *Ibid.* But the ALJ addressed this issue head-on, differentiating between Dr. Barreras's "*mental medical* source status report" and his "*medical physical* source statement" and comparing each—independently—to *all* the other opinions in the record. *See* ALJ Decision at 10–11. Setting aside the ALJ's commentary about the "dramatic departure" between Dr. Barreras's two reports, she *also* found the July 2021 report unpersuasive because (a) it was "not supported by Dr. Barreras's longitudinal treatment notes," (b) it "is inconsistent with the record as a whole," and (c) it "is also inconsistent with the claimant's reports and testimony as to her activities of daily living." *Id.* at 11. Having reviewed the record in detail, we agree with these three points.

In any case, like the ALJ, we *are* troubled by the material incongruities between Dr. Barreras's November report—in which he concluded that Alvarado was "capable of sustaining work activity for eight hours a day, five days a week," R. at 634—and his July report, which declared that Alvarado "cannot work," *id.* at 639. And our careful examination of both reports does little to allay our concerns: In November, for example, Dr. Barreras believed that Alvarado's thought process was "coherent," her concentration was "good," and he described her as displaying a "complete understanding of daily activities." *Id.* at 633–34. In July, however, he found her to have a "0%" ability to "concentrate . . . understand simple instructions . . . use judgment" or perform other basic mental tasks—all radical departures from the observations he noted just eight months earlier. *Id.* at 640. This might not be such

a big deal—except that it's directly inconsistent with Alvarado's own testimony before the ALJ, in which she "reported overall normal activities of daily living, including preparing complete meals two to three times a day, gardening/caring for her plants, light household chores, grocery shopping, spending time with her family, independent personal care, no problems handling her finances, and driving[.]" ALJ Decision at 10. We cannot say that, in weighing these two radically different opinions from Dr. Barreras, the ALJ was wrong to disregard the one that was belied by Alvarado's own testimony.

To recap: We would have been justified in disregarding Alvarado's Second and Third Objections because they simply reiterate the arguments Alvarado made to the Magistrate Judge—*without* identifying any errors in the R&R. In any event, having reviewed these Objections on the merits, we find no error in the way Magistrate Judge Hunt disposed of these arguments and, thus, **OVERRULE** Alvarado's Second and Third Objections. With those out of the way, we turn now to Alvarado's three remaining Objections—all of which she's advanced *properly*.

## I.       The First Objection

In her First Objection, Alvarado suggests that Magistrate Judge Hunt erred in finding that substantial evidence supports the ALJ's conclusions about "manipulative restrictions" (*i.e.*, Alvarado's ability to use her fingers). *See* Obj. at 1–3. To counter the Magistrate Judge's determination that "'medication was treating these [hand and finger] conditions, [that] Plaintiff's examinations were mostly normal[,] and [that] the Plaintiff could perform a wide range of activities . . . which require finger manipulation,'" *id.* at 1 (quoting R&R at 6), Alvarado proceeds along three fronts. *First*, she posits that her visits to an orthopedic surgeon (Dr. Schiuma)—standing alone—"evidence[ ] that these were significant problems that could not be resolved with medications." *Id.* at 1–2. *Second*, she claims that the ALJ "cherry-picked facts that supported her decision"—mainly, the list of Alvarado's daily-living activities—and "ignored the facts. . . indicating that the Plaintiff could not perform these tasks

consistently and at a normal pace." *Id.* at 2. *Third*, she says that "the 'mostly normal' examinations were in fact mostly abnormal since at least October 2020," when her "treatment visit showed an abnormality with trigger fingers." *Id.* at 2. And (she adds) her "condition clearly deteriorated" by April and May of 2021. *Id.* at 2–3. We reject each of these three parts of Alvarado's First Objection because (1) the ALJ sufficiently explained why she weighed (and discounted) Dr. Schiuma's opinion, (2) Alvarado is simply wrong to suggest that the ALJ cherry-picked facts about her ability to perform daily tasks, and (3) the ALJ relied on substantial evidence in concluding that Alvarado's exams were "mostly normal."

### A.     Dr. Schiuma

The evidence in the record substantially confirms the ALJ's view that Alvarado's ailments were (and are) alleviated by the available medical treatments. And the ALJ discounted Alvarado's testimony about the severity of her hand and finger limitations only *after* she completed her detailed recitation of Alvarado's relevant medical history.

What did that medical history show? As we've said, in October of 2020, Dr. Barreras changed Alvarado's medication in an effort to ameliorate her joint pain. *See supra* at 6; ALJ Decision at 9. That same month, Dr. Luna examined Alvarado, and the results were "overall normal." ALJ Decision at 9. Aside from "some mild difficulty opening her left fingers after closing them in a tight grip," Alvarado's "fine and gross motor manipulations were normal bilaterally." *Ibid.* And this relatively normal function accords with Alvarado's medical records, which reflect *no other medical treatment* for hand or finger pain—except for two appointments with Dr. Schiuma in the Spring of 2021. At the first, in April 2021, Dr. Schiuma prescribed a Medrol Dosepak to "quiet things down" and instructed Alvarado that, "if she still has pain[,] then she should come here for injections in her hands." R. at 636. At the second, in May 2021, Alvarado returned for injections "into the plantar surface of her left heel," though (notably) *not* for her hands—because, for her hands, "she was [again] given a prescription for a Medrol

Dosepak which should quiet down the multiple trigger fingers. She was also given a prescription for tramadol which she can take occasionally for pain." *Id.* at 635.

So, what can we draw from all this? Two things: *One*, we can't accept Alvarado's view that "the fact that [she] ultimately had to go and see an orthopedic surgeon . . . evidences that these were significant problems that could not be resolved with medications," Obj. at 1–2, because the orthopedic surgeon *is the one who prescribed those medications*, R. at 635–36. *Two*, those medications *do* appear to have alleviated Alvarado's hand pain. After all, when she returned for the second appointment in May, she opted for injections in her *feet*—but (notably) *not* in her hands. *See ibid.* And, as the ALJ noted (ALJ Decision at 10), her decision in this regard is significant because Dr. Schiuma had told her back in April that, "if she still has pain[,] then she should come here for *injections* in her hands." R. at 636 (emphasis added).

### B.    Cherry-Picked Facts

We likewise reject Alvarado's claim that "[t]he ALJ essentially cherry-picked facts [about Alvarado's ability to perform daily-living activities] that supported her decision" and ignored "that [Alvarado] specifically stated that she is performing such activities at a slow pace in order to avoid overexerting herself." Obj. at 2. The ALJ repeatedly recognized that Alvarado "has to do things at a slow pace and not overexert herself," that "it hurts to dress and bathe herself and care for her hair because it is painful to bend or put her arms up too long," that she "has to cook at a slow pace," and that she "enjoys cooking, tending to her garden, and watching TV, which she does often but at a slower pace[.]" ALJ Decision at 7–8. So, Alvarado's simply wrong to suggest that the ALJ "ignored" this evidence. Again, what Alvarado is really getting at here is her view that the ALJ weighed this evidence incorrectly. In so suggesting, however, Alvarado runs up against the same well-established rule we cited earlier—the one that prohibits us from "reweigh[ing] the evidence or substitut[ing] [our] judgment" for the ALJ's. *Bloodsworth*, 703 F.2d at 1239 (cleaned up).

### C.    "Mostly Normal" Examinations

Finally, we cannot accept Alvarado's claim that "the 'mostly normal' examinations were in fact mostly abnormal since at least October 2020," Obj. at 2, and that "the 'mostly normal' examinations which the ALJ referenced did not provide substantial evidence for the ALJ's decision," *id.* at 3. Here, Alvarado points to three examinations: the October 2020 appointment with Dr. Barreras; the April 2021 visit with Dr. Schiuma; and the May 2021 meeting with Dr. Schiuma. *Ibid.*

Alvarado's right that, at all three of these appointments, she complained of pain in her hands (or fingers), which her doctors then treated with medication. The ALJ, as we've already seen, balanced these complaints against Dr. Luna's consultative exam—also from October 2020—where the results were "overall normal." ALJ Decision at 9. At that exam, Dr. Luna noted that Alvarado reported her "left hand is in pain and she has difficulty with her fingers." R. at 618. She also observed that Alvarado "reports that since her right shoulder surgery she has a hard time using her right hand. She reports numbing and aching pain." *Ibid.* After her examination, though, Dr. Luna noticed "no deformity, redness, *or tenderness*" in Alvarado's extremities, "normal fine or gross motor manipulation" in both hands, and "normal grip strength 5/5 (5 max)" (again, in both hands). *Id.* at 619 (emphasis added). In fact, the *only* objective indication Dr. Luna observed of *any* issue with Alvarado's hands was that "[s]he did have some mild difficulty opening her left fingers after closing them in a tight grip." *Ibid.* Overall, Dr. Luna concluded, the "[p]hysical examination was within normal limits," and the "[o]rthopedic examination was within normal limits for age and condition." *Id.* at 620. And these minimal findings are perhaps not surprising since Alvarado told Dr. Luna that she had "the ability to perform the following activities independently: feeding, using public transportation, performing personal hygiene, cooking, managing funds, buttoning and unbuttoning shirts and pants." *Id.* at 619. All of this is to say that Alvarado did indeed have a normal exam in October 2020—just two days *after* her last visit with

Dr. Barreras. *Compare* R. at 582 (Dr. Barreras's final notes, dated October 20, 2020), *with id.* at 618 (Dr. Luna's exam notes, dated October 22, 2020).

Which brings us to Dr. Schiuma's abnormal exams. In April 2021, Alvarado complained "of pain in both hands, both knees, and both feet." *Id.* at 636. She told Dr. Schiuma "that she works cleaning and she has been having pain in her hands now for a couple of years," and that "her hands, her knees, and her feet have gotten worse after the cancer medication." *Ibid.* A physical exam revealed "evidence of trigger fingers in multiple fingers especially the 4th finger on the right and the 3rd finger on the left." *Ibid.* Dr. Schiuma recorded that "[Alvarado] tells me that she is going to have her 2nd COVID-19 vaccination in five days' time, consequently she cannot be given any cortisone today." *Ibid.* So, he gave her "a prescription for a Medrol Dosepak which she should start two weeks after she has had the 2nd vaccination." *Ibid.* Dr. Schiuma advised that, "if the Medrol Dosepak quiet[s] things down, she does not need to return. On the other hand, if she still has pain then she should come here for injections in her hands." *Ibid.* In sum, Alvarado complained of pain, Dr. Schiuma identified the "trigger fingers" our ALJ would later credit as "medically determinable," and then Dr. Schiuma gave her a prescription to try out. If that didn't work, plan B was an injection. So far, so good.

A month later (May 2021), Alvarado returned, "complaining of pain in the left heel and pain in multiple fingers." *Id.* at 635. When Dr. Schiuma examined her, he observed "tenderness over the flexor tendons of multiple fingers in both hands" and "what appears to be bilateral trigger fingers in multiple fingers." *Ibid.* At this May appointment, Dr. Schiuma "injected [Alvarado] with Decadron and Xylocaine into *the plantar surface of her left heel*," and gave her—again—"a prescription for Medrol Dosepak which should quiet down the multiple trigger fingers." *Ibid.* (emphasis added).

And that's it: The record shows absolutely no follow-up care after that May appointment with Dr. Schiuma. *See generally* R. So, while it's true that Alvarado had two "abnormal" appointments in April and May of 2021—in which she complained of painful trigger fingers—she unequivocally turned

down the more intensive injections Dr. Schiuma had offered, opting instead for another round of the oral medication she'd received in April. We think it eminently reasonable for the ALJ to have concluded, based on this chronology, that Alvarado made this decision only *because* the medication was allaying her pain.

As we've indicated, then, substantial evidence supports the ALJ's evaluation of the extent of Alvarado's hand and finger pain. The ALJ found, for instance, that Alvarado suffers from "medically determinable trigger fingers," *id.* at 4, and has "hand and finger problems," *id.* at 7. Still, the ALJ observed, Alvarado's medical records, *id.* at 9, and her *own* testimony about her capacity to perform daily-living activities with her fingers, *id.* at 7–8, belie her complaints about debilitating finger pain. Recall, for example, that the October 2020 consultative examination revealed "no deformity, redness, or tenderness*"* in Alvarado's extremities, "normal fine or gross motor manipulation" in both hands, and "normal grip strength 5/5 (5 max)" (again, in both hands), R. at 619; that Alvarado sought *no* treatment for her trigger fingers after Dr. Schiuma prescribed the steroid pills, *see generally* R.; and that Alvarado declined pain-relieving injections in her hands (even though she opted for one in her foot) and chose to stay on the oral mediation instead, *id.* at 635. Then there's Alvarado's own testimony— in which she conceded that she "take[s] care of the plants," *id.* at 60; showers herself, *id.* at 61; and "cooks" for "both [lunch and dinner]," *ibid.* None of this was new. Alvarado (remember) had told Dr. Luna, back in October 2020, that she could do the following things independently: "feeding, using public transportation, performing personal hygiene, cooking, managing funds, buttoning and unbuttoning shirts and pants." *Id.* at 619.

The ALJ's assessment of the extent of Alvarado's finger limitations, in short, rests on "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Lewis*, 12 F.3d at 1439. Because it's simply not our province to "reweigh the

evidence or substitute our judgment" for the ALJ's, *Bloodsworth*, 703 F.2d at 1239, we **OVERRULE** the First Objection.

## II.       The Fourth Objection

In her Fourth Objection, Alvarado claims that "[t]he ALJ concluded that the Plaintiff has certain mild mental limitations, but failed to explain how these limitations affect her RFC and improperly failed to include these limitations in the RFC assessment." Obj. at 4. "The ALJ's failure to exclude the mental limitations from the hypothetical question to the VE," Alvarado continues, "cannot be harmless where the ALJ chooses to rely on the VE testimony rather than the DOT." *Id.* at 5. And, according to Alvarado, Magistrate Judge Hunt was "incorrect" when he found that "the Plaintiff did not identify any limitations caused by mild mental limitations that would 'prevent [her] from performing the type of light work described in the RFP.'" *Ibid.* (quoting R&R at 12). We disagree.

The second half of this Objection—that the ALJ "improperly failed to include [mild mental limitations] in the RFC assessment," *id.* at 4—is simply not true.[9] In Step Two of her analysis, the ALJ found that Alvarado's "medically determinable mental impairment of depressive disorder . . . does not cause more than a minimal limitation in [her] ability to perform basic mental work activities and [is] therefore nonsevere." ALJ Decision at 5. The ALJ's conclusion rested on her consideration of the "Paragraph B Criteria." *See ibid.* As relevant here, the ALJ found "mild limitations" in all four criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* at 5–6. After assessing each of these limitations, the ALJ determined that, "[b]ecause [Alvarado's] medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in [her] ability to do basic work

---

[9] Indeed, just one sentence later, Alvarado admits that "the ALJ herself listed such limitations when rating the Plaintiff's mental impairments." Obj. at 5.

activities, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))." *Id.* at 6 (emphasis in original). And the ALJ's RFC assessment at Step Four "reflect[ed] the degree of limitation [she] found in the 'paragraph B' mental functional analysis." *Ibid.* For example, the ALJ incorporated into her RFC computation Alvarado's complaints about (1) her forgetfulness ("she needs help/reminders to take her medication because she is forgetful at times," *id.* at 7; "she forgets a lot of things, especially dates and times," *id.* at 8); (2) her difficulty maintaining pace ("she has to do things at a slow pace and not overexert herself," *id.* at 7); and (3) her inconsistency with self-management ("she needs help lifting and bending," *id.* at 8; "[she] needs help with laundry," *ibid.*). We thus reject Alvarado's Fourth Objection to the extent it's based on the ALJ's failure to include "mild" mental limitations in the RFC assessment.

But here's the thing: Even if the ALJ *hadn't* included these mild mental limitations in her RFC, that omission wouldn't have altered the outcome of our case.[10] "[T]he persuasive precedent demonstrates that ALJs are not obligated to include mental limitations in the RFC even when they find 'mild' limitations while completing a PRTF." *Chestang v. Comm'r of Soc. Sec.*, 2022 WL 4354849, at *8 (M.D. Fla. Sept. 20, 2022) (McCoy, Mag. J.) (collecting cases); *see also Williams v. Soc. Sec. Admin.*, 661 F. App'x 977, 979–80 (11th Cir. 2016) ("[Williams] asserts that the ALJ erred in failing to include limitations due to the effects of his depression in his RFC assessment. . . . the ALJ took into account

---

[10] In *Chestang v. Comm'r of Soc. Sec.*, the "Plaintiff argue[d] that the failure to include mental functional limitations in the RFC constituted error because the 'mild' limitations in the paragraph B criteria required the ALJ to include mental limitations in the RFC." 2022 WL 4354849, at *8 (M.D. Fla. Sept. 20, 2022) (McCoy, Mag. J.). The court rejected this argument—which, of course, is the same argument Alvarado advances here—reasoning: "[I]t appears that Plaintiff conflates (1) limitations in the paragraph B criteria, *see* 20 C.F.R. § 404.1520a, with (2) limitations in a claimant's RFC, *see* 20 C.F.R. § 404.1545. The limitations in the paragraph B criteria help the ALJ determine the severity of a claimant's mental impairments or whether a claimant meets a listing, while limitations in the RFC help the ALJ determine the level of work that a claimant can perform. *Compare* 20 C.F.R. § 404.1520a, *with* 20 C.F.R. § 404.1545. Plaintiff has provided no authority suggesting that the two are the same or that an ALJ must include mental limitations in the RFC on finding 'mild' limitations in the paragraph B criteria." *Ibid.* We agree with *Chestang*'s assessment of the relevant regulatory framework.

Williams's medically determinable mental impairment in establishing limitations in the RFC assessment, and found that Williams had only 'mild' limitations based on this impairment."); *Medwit v. Comm'r of Soc. Sec.*, 2021 WL 1341390, at *5 (M.D. Fla. Feb. 22, 2021) (Mizell, Mag. J.) ("Since the ALJ only assessed 'mild' limitations in the four areas of mental functioning, the ALJ did not err by not providing a mental RFC."), *report and recommendation adopted*, 2021 WL 1138179 (M.D. Fla. Mar. 25, 2021) (Badalamenti, J.); *Bryant v. Comm'r of Soc. Sec.*, 2021 WL 4067464, at *11 (M.D. Fla. July 29, 2021) (Mizell, Mag. J.) ("[T]he ALJ found mild limitations in all four functional areas[, but] did not err in failing to include [functional] limitations in the RFC related to [the plaintiff's] depression, anxiety, bipolar disorder, or insomnia."), *report and recommendation adopted*, 2021 WL 3855941 (M.D. Fla. Aug. 30, 2021) (Badalamenti, J.); *Eutsay v. Kijakazi*, 2022 WL 1609088, at *9 (S.D. Fla. May 4, 2022) (Otazo-Reyes, Mag. J.) (finding that the ALJ was not required to include "mild" mental limitations in the RFC), *report and recommendation adopted*, 2022 WL 1605318 (S.D. Fla. May 20, 2022) (Bloom, J.).

Finally, and for two reasons, Alvarado is wrong to suggest that "[t]he ALJ's failure to [include the Plaintiff's mental limitations in the RFC] resulted in an incomplete hypothetical question to the VE"—a deficiency that (Alvarado claims) rendered the ALJ's decision "unsupported by substantial evidence." Obj. at 6. *First*, as we've said, the ALJ *did* incorporate Alvarado's mild mental limitations into her RFC analysis. *See supra* at 24–25; ALJ Decision 7–8. *Second*, because the ALJ found that Alvarado's mental limitations were "mild," *id.* at 6, she didn't err by failing to *enumerate* those limitations *either* in the RFC *or* in her hypothetical to the VE. *See Williams*, 661 F. App'x at 981 ("The ALJ did not err in his decision about the severity of Williams' depression or in the limitations included in the RFC assessment. . . . [T]he ALJ took into account Williams's medically determinable mental impairment in establishing limitations in the RFC assessment, and found that Williams had only 'mild' limitations based on this impairment."); *see also Harris v. Saul*, 2021 WL 1016128, at *5 (M.D. Fla. Mar. 17, 2021)

(Klindt, Mag. J.) ("Given that the limitations found by the ALJ were only mild, the undersigned finds no error in the ALJ's hypothetical.").

In sum, the ALJ *did* consider Alvarado's mild mental limitations in her RFC assessment—even though she didn't have to. Alvarado may disagree with the ALJ's conclusion about the extent of those limitations. But that doesn't mean the ALJ "failed" to consider them, and (again) it's simply not our role to reweigh the evidence. *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner. . . . If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." (cleaned up)). We thus **OVERRULE** Alvarado's Fourth Objection.

## III.    The Fifth Objection

In her Fifth Objection, Alvarado urges us to "carefully consider the accuracy" of Magistrate Judge Hunt's conclusion that the "Eleventh Circuit endorsed Job Browser Pro methodology." Obj. at 6. Alvarado insists that "the VE relied solely on the third-party software for providing the job numbers"; as a result, she says, his opinions were "unreliable and in violation of *Goode* and result[ed] in a decision unsupported by substantial evidence." *Id.* at 6–7. Again, we disagree.

*First*, let's review what the Magistrate Judge actually said on this issue: "However, the court [in *Breaux v. Comm'r of Soc. Sec.*, 2021 WL 3721547 (S.D. Fla. Aug. 26, 2021) (Altonaga, C.J.)] stated that the Eleventh Circuit has specifically identified that one acceptable method to be used by a vocational expert, in conjunction with the vocational expert's own knowledge and expertise, is 'the occupational density method.'" R&R at 16 (quoting *Breaux*, 2021 WL 3721547, at *2). In other words, the Magistrate Judge quoted a district court as holding that, after the Eleventh Circuit's decision in *Goode*, a VE may deploy the occupational-density method (together with his own knowledge and experience) in arriving at an acceptable conclusion. This is exactly right.

*Goode* observed that "there are various methods available to a vocational expert, to be used in conjunction with his knowledge and expertise." 966 F.3d at 1284. One of those available methods, the Eleventh Circuit explained, is "the occupational density method[, which] approximates job numbers using a software program known as JobBrowser Pro from SkillTRAN[.]" *Ibid.* Indeed, the court only discussed JobBrowser in *Goode* "so that [JobBrowser and another method] will be on the table when the matter returns to the ALJ" on remand. *Ibid.* The R&R was thus plainly right when it said: "[T]he Eleventh Circuit has specifically identified that *one acceptable method* to be used by a vocational expert, *in conjunction with the vocational expert's own knowledge and expertise*, is 'the occupational density method' . . . using a software program known as Job Browser Pro from SkillTRAN[.]" R&R at 16 (emphasis added).

With all that sorted, we'll turn to the VE's testimony before the ALJ. As Alvarado has noted, the VE's testimony opened with the following back-and-forth:

Q: I'll assume your testimony today will be based on your knowledge, education, training, experience, and it will be consistent with the DOT unless you tell me otherwise.

A: Yes, ma'am.

R. at 63. According to Alvarado, the VE "told the ALJ otherwise" in the following exchange:

Q: And what's the source of your job numbers?

A: I utilize the Job Browser Pro which is accepted by the Social Security Administration.

*Id.* at 67; *see also* Pl.'s MSJ at 19 ("The VE did not identify any other source for the job numbers. Therefore the VE relied solely on Job Browser Pro for the job numbers, and the VE may not rely on this source as the sole source of job numbers he provides[.]"). This argument borders on frivolity. As the VE made clear, he answered *every* question—including this one—in a way that comported with his "knowledge, education, training, [and] experience[.]" R. at 63. And there's (obviously) no rule that required the VE, in response to every subsequent question, to remind us that whatever answer he gave

was "based on [his] knowledge, education, training, experience, and . . . consistent with the DOT[.]" *Ibid.* That was the whole point of the ALJ's initial question: to ensure that the VE *wouldn't* have to repeat the incantation "based on my knowledge, education, training, and experience" as a stilted (and annoying) preamble to every answer. The VE, in short, was simply saying that, in conjunction with his "knowledge, education, training, experience, and . . . consistent with the DOT," he "utilize[d] the Job Browser Pro[,] which is accepted by the Social Security Administration." *Id.* at 67. And Alvarado (notably) concedes that *Goode* "instructed t[he] ALJ to use any available methods such as Job Browser's Pro occupational density method 'in conjunction with the VE's knowledge and expertise.'" Obj. at 6 (quoting *Goode*, 966 F.3d at 1284 (cleaned up)).

Because the VE offered the ALJ substantial evidence on which to base her decision, this Fifth Objection is likewise **OVERRULED**.

*     *     *

After reviewing the opinions of Alvarado's doctors and the SSA's medical experts, together with the other record evidence (much of it from Alvarado's own words or from her treating physicians' notes), the ALJ reached a reasonable decision that's supported by substantial evidence. Because the R&R hasn't left us "with a definite and firm conviction that a mistake has been committed," *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1523 (11th Cir. 1997), we **ORDER AND ADJUDGE** as follows:

1. Alvarado's Objections [ECF No. 18] are **OVERRULED**.

2. The Report and Recommendation [ECF No. 17] is **ACCEPTED and ADOPTED**.

3. The Plaintiff's Motion for Summary Judgment [ECF No. 11] is **DENIED**.

4. The Defendant's Motion for Summary Judgment [ECF No. 15] is **GRANTED**.

5. Pursuant to Federal Rule of Civil Procedure 58, final judgment will be entered separately.

6.      The Clerk of Court shall **CLOSE** this case. All other pending motions are **DENIED**

**as moot**. And all other deadlines are **TERMINATED**.

**DONE AND ORDERED** in the Southern District of Florida on March 16, 2023.


_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record